NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-159                                          Appeals Court

   PAUL J. CONWAY, trustee,[1] & another[2] vs.  THOMAS CARAGLIANO &
                            others.[3]

                          No. 22-P-159.

        Suffolk.     February 2, 2023. - June 29, 2023.

          Present:  Green, C.J., Rubin, & Massing, JJ.


Real Property, Registered land:  easement, Beach, Easement,
      Deed.  Beach.  Easement.  Way, Private.  Deed,
      Construction.  Land Court.



      Civil action commenced in the Land Court Department on
October 5, 2018.

      Motions for summary judgment were heard by Michael D. Vhay,
J., and the case was also heard by him.


_____

        [1] Of the Riftwood Irrevocable Trust.

        [2] Gail M. Conway, as trustee of the Riftwood Irrevocable
Trust.

        [3] John A. Caragliano and Anne C. Caragliano, as trustees of
the CBC Irrevocable Trust, the TAC Irrevocable Trust, and the
JJC Irrevocable Trust, interveners.  The complaint named only
Thomas Caragliano as a defendant.  The judge allowed John A. and
Anne C. Caragliano, as trustees of the three trusts, to
participate in the case as "defendant-interveners."

Joshua M. D. Segal (Michael Williams also present) for the plaintiffs.
David C. Uitti for the defendants.

MASSING, J.  This appeal involving registered land concerns the ownership of a way providing access to the shore and the extent of easement rights in the way, if any, appurtenant to an inland property.  The plaintiffs, owners of waterfront property in the town of Falmouth that abuts the way, appeal from decisions of a Land Court judge declaring that they do not own a fee interest in the way; declaring that the defendant inland property owners have an easement, in common with the plaintiffs and others, permitting them to use and occupy the way; and ordering the plaintiffs to remove encroachments on the way that interfere with the defendants' access and use.

Parting company with the judge, we conclude that the plaintiffs do own the fee in the way by operation of the derelict fee statute.  See G. L. c. 183, § 58.  Nonetheless, we agree with the judge that the defendants' property enjoys an easement over the way.  Concluding that the scope of the easement is not as broad as the judge determined, however, we vacate those portions of the judgment and remand for the entry of orders modifying the scope of the defendants' easement as set forth herein and for further proceedings regarding the actions

the plaintiffs must take to permit the defendants to exercise their easement rights.

Background. 1. Chain of title. The following facts, which we draw from the summary judgment record, Assad v. Sea Lavender, LLC, 95 Mass. App. Ct. 689, 690 (2019), and our independent review of the documentary evidence, Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018), are not disputed. In addition, we have taken judicial notice of certain relevant instruments contained in the Land Court records section of the Barnstable registry of deeds, all of which are readily available to the public both in person and on line.[4]

The plaintiffs, Paul J. Conway and Gail M. Conway, as trustees of the Riftwood Irrevocable Trust (the Conways), own registered waterfront land in Falmouth with an address on Westwood Road. The Conways' parcel is bounded by Buzzards Bay to the north, Westwood Road to the south, and to the west, the land at the center of this dispute: a forty-foot wide way that leads from Westwood Road to the water, known as the "7th Shoreway." Defendants John and Anne Caragliano, as trustees of three trusts, own inland property on Westwood Road, directly

_____

[4] See Hickey v. Pathways Ass'n, Inc., 472 Mass. 735, 762 n.34 (2015) (taking judicial notice of plans on file with the land registration office); Jarosz v. Palmer, 436 Mass. 526, 530 (2002) ("a judge may take judicial notice of the court's records in a related action").

across from the 7th Shoreway and the Conways' property. Defendant Thomas Caragliano was one of the original purchasers; we refer to defendants collectively as the Caraglianos.[5]

The parties came to own their properties as follows. By 1950, a single owner, Earl Boardman, had amassed a large parcel of land on Buzzards Bay in what is now known as the Nyes Neck neighborhood of North Falmouth. Boardman's property had been registered in the 1920s by prior owners under two certificates of title filed in Land Court Registration Case No. 11518.[6] In the K Plan, dated January 1950 and registered on May 22, 1950, Boardman merged the two original plans into a single plan. Much of the land shown on the K Plan has no boundaries, but the plan does depict several streets and ways providing access to ten numbered parcels. Boardman's certificates of title provided, "The streets and ways shown on [the K Plan] are subject to the rights of all persons lawfully entitled thereto in and over the same."

---

[5] A sketch showing the parties' properties and the 7th Shoreway, along with other neighboring lots and shoreways, is attached to this opinion as an Appendix.

[6] The record appendix contains lettered Plans 11518-A, 11518-F, 11518-G, and 11518-J through 11518-Z, followed by numbered Plans 11518-1 through 11518-22, which postdate the lettered plans. We refer to the plans in Case No. 11518 by their letter or number.

As he developed the property, Boardman transferred lots by deeds that included the following or similar language:  "There is appurtenant to the premises a right of way in common with others in and over the private ways shown on the plans now filed in this case."  At first Boardman subdivided only a few lots at a time, but the T Plan, dated May 5, 1951, and registered on May 28, 1951, created a mix of more than one hundred waterfront and inland lots.  As shown on the T Plan, interconnecting subdivision ways provided street access to the lots.  Six "shoreways" appearing on the T Plan (labeled 1st, 2nd, 3rd, 4th, 5th, and 6th Shoreway), located intermittently between waterfront lots, connected the inland subdivision ways to Buzzards Bay.  A small portion of what is now the Caraglianos' lot is marked as lot C2 on sheet 1 of the T Plan.  North and east of the numbered lots on sheet 1, the T Plan shows undeveloped land belonging to Boardman that would later be subdivided to form the parties' parcels.

Boardman deeded lot C2 to Charles B. Hazard and Ethel Hazard shortly after registration of the T Plan.  Then in 1962, Boardman conveyed to the Hazards substantial portions of his property shown on the T Plan and the subsequent V, Y, and 1 Plans.  The deed also transferred to the Hazards "the fee in the soil of all of the [w]ays shown [on the T and V Plans] not heretofore conveyed by me, and subject to easements of record,

reserving to [Boardman], for the benefit of his remaining land, the right to use in common with others entitled thereto, the ways and beaches as shown on plans in Land Court Case No. 11518."

The disputed 7th Shoreway first appeared on the 13 Plan, dated October 27, 1961, and registered on October 4, 1967; it is located directly across Westwood Road from lot C2. The 13 Plan also extended and terminated Westwood Road in a cul de sac surrounded by three new lots: lot 211, a waterfront lot abutting the 7th Shoreway to the east (now the Conways' lot); lot 212, a waterfront lot to the east of lot 211; and lot 213, an inland lot across Westwood Road from lots 211 and 212. Lot 213 included land that, together with lot C2, now comprises the Caraglianos' lot.

The lots shown on the 13 Plan were sold off in the mid-1970s. By a deed dated September 19, 1975, and registered on September 25, 1975, Boardman conveyed lot 212 (the lot adjacent to the Conways' lot) to Ralph P. Pellegrini, Inc. Some months later, Boardman transferred lot 211 (the Conways' lot) to Evangeline T. Anthony, by a deed dated September 23, 1975, and registered on May 6, 1976 (Anthony deed). And by a deed dated September 19, 1975, prior to the Anthony deed, but registered on May 17, 1976, after the Anthony deed, Boardman transferred lot 213 to Earl and Ethel Hazard. All three deeds included this

identical provision: "There is appurtenant to the described premises a right of way in common with others entitled thereto in and over the provided ways shown on plans in registration case No. 11518."

At the time the Hazards acquired lot 213, they already owned lot C2, and by the 17 Plan, registered on September 12, 1978, they reconfigured the lot lines and created lot 242 by adding to lot C2 a portion of lot 213.[7] The Caraglianos acquired lot 242 on March 15, 1991. Their certificate of title employs the same language used in the Pellegrini, Anthony, and Hazard deeds: "There is appurtenant to said land a right of way in common with others entitled thereto in and over the way shown on the plans in case number 11518." In addition, it states, "Said land is subject to the reservation to Earl G. Boardman, for the benefit of his remaining land, of the right to use in common with others entitled thereto the ways and beaches shown on the plans in Land Court Case No. 11518."

The Conways acquired lot 211 on July 28, 2000. Their certificate of title states succinctly, "There is appurtenant to said land a right of way over the ways in common with all others entitled thereto."

---

[7] From the remainder of lot 213, the 17 Plan created lot 241, another inland lot east of lot 242.

2.  Use of the 7th Shoreway.  After a trial, which included
a view, the judge made the following findings of fact, none of
which are contested on appeal.  In 1991, when the Caraglianos
purchased their property, the Conways' property was a vacant
lot, but someone had been mowing the 7th Shoreway, which
consisted of nothing but grass leading to a steep embankment.
At the time of trial, four of the other shoreways were also
grassy, the 5th Shoreway was partially paved, and the 6th
Shoreway was paved along almost the entire length with a
community boat launch at the end.

The judge found that "the Caragliano family and their
invited guests used the 7th Shoreway for purposes that included
walking to and from the beach and the ocean (including carrying
beach chairs, floaties, and other materials); fishing;
transporting and launching kayaks, dinghies and sailboats
. . . ; sitting and watching sunsets, the ocean, fireworks, boat
races, and birds; having picnics and/or drinks; recreating
(playing catch, frisbee, and badminton, or flying kites) and
occasionally parking cars."

In 2009, the then-owners of the Conways' property placed a
bocce court within the 7th Shoreway, installed an irrigation
system, and added landscaping along the way's border with their
lot.  Between 2018 and 2019, the Conways removed the bocce court
and regraded the 7th Shoreway, raising its height to meet the

rest of their property, and leaving only an eight-to-ten foot wide grassy strip along the side farthest from their house.  The irrigation system caused water to build up on the strip, leaving it wet and slippery.  The Conways also used large stones to retain the raised portion of the 7th Shoreway and planted bushes near and around those stones.  They also reconfigured their driveway, in the process paving over the entire width of the 7th Shoreway where it meets Westwood Road, such that anyone seeking to use the 7th Shoreway would have to cross part of the Conways' driveway.

3.  <u>Prior proceedings and rulings</u>.  The Conways commenced this action in the Land Court, seeking a declaration that they owned the fee in the 7th Shoreway and that the Caraglianos had no easement rights in it.  The Conways claimed that by parking on and using the way, the Caraglianos were trespassing and creating a nuisance.  The Caraglianos filed an answer and counterclaims seeking a declaration that their property enjoyed easement rights in the 7th Shoreway (and, if necessary, reformation of the parties' deeds to that effect) and an order requiring the Conways to remove encroachments and restore the 7th Shoreway to its prior state.

On cross motions for summary judgment, the judge declared that the original grantor, Boardman, retained the fee in the 7th Shoreway and that the Caraglianos -- as well as the Conways

-- have easement rights in common with others over the way.  The judge then conducted a trial to determine whether the Conways had interfered with the Caraglianos' easement rights, ultimately determining the scope of the easement and ordering the Conways to remove encroachments that interfered with those rights.  (We reserve the judge's conclusions regarding the scope of the easement and the Conways' interference for later discussion.) The Conways appeal.

Discussion.  1.  Ownership of the 7th Shoreway.  "We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Where the parties filed cross motions for summary judgment, we determine whether either party is entitled to judgment as a matter of law" (quotations and citations omitted).  Assad, 95 Mass. App. Ct. at 693.  See Darman v. Dunderdale, 362 Mass. 633, 637 (1972) ("If the Land Court judge reached his view of the grantor's intention solely from the documentary evidence, this court has the same interpretive powers as the Land Court judge").

The Conways claim that they own the fee in the 7th Shoreway by operation of the derelict fee statute, and that the judge erred in concluding that Boardman retained ownership rights

therein.  We emphasize at the outset that our resolution of this question is separate and apart from the question of the existence and scope of the Caraglianos' easement rights.  See Kubic v. Audette, 98 Mass. App. Ct. 289, 302 (2020), S.C., 102 Mass. App. Ct. 228 (2023), quoting Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 389 (2005) ("'the derelict fee statute pertains only to the question of ownership of the fee' in a way; it is not concerned with the existence or nature of any easement rights there").

   As pertinent here, the derelict fee statute provides, "Every instrument passing title to real estate abutting a way, whether public or private . . . shall be construed to include any fee interest of the grantor in such way, . . . unless . . . the instrument evidences a different intent by an express exception or reservation."  G. L. c. 183, § 58.  The statute "establishes an authoritative rule of construction" that "every deed of real estate abutting a way includes the fee interest of the grantor in the way."  Tattan v. Kurlan, 32 Mass. App. Ct. 239, 242-243 (1992).  While it previously had been possible to rebut a common-law presumption to the same effect with other evidence of the parties' intent, for instruments subject to the derelict fee statute the presumption is conclusive unless the instrument on its face expressly provides otherwise.  See id. at 243-244.  "The effect of the statute is 'to quiet title to

sundry narrow strips of land that formed the boundaries of other tracts,'" which "has the salutary effect of promoting repose; by creating a robust presumption that the adjacent land owner acquired title to the way, the statute serves to discourage others from trying to search ancient deed records for 'lost' fee interests upon which a competing claim to title could be based." Kubic, 98 Mass. App. Ct. at 302, quoting Rowley v. Massachusetts Elec. Co., 438 Mass. 798, 803 (2003).

The first instrument passing title to the Conways' lot, the Anthony deed, described lot 211 as bounded by the 7th Shoreway. The language of the Anthony deed plainly did not contain an express reservation of a fee interest. It referred to an appurtenant "right of way in common with others entitled thereto in and over the provided ways shown on plans in registration Case No. 11518." The dissent contends that this language amounts to an express reservation of the fee interest in the ways shown on the plans because it granted less than a fee interest. We disagree. The Anthony deed does not mention the fee interest in the ways on the plans, let alone include a reservation, exception, or exclusion of the fee in those ways, let alone the fee interest in the 7th Shoreway. Designations that "may give rise to nonpossessory, nonexclusive easements or rights of way in the grantors and their successors in interest . . . are plainly not express reservations of the underlying

fee." Tattan, 32 Mass. App. Ct. at 245. The dissent is arguing, in effect, that the easement language implicitly reserved a fee interest. But "only an express reservation of the fee in the way can overcome the presumption created by the statute" that the purchaser of land bordering a way acquires the grantor's fee interest in the way. Kubic, 98 Mass. App. Ct. at 302 (deed transferred fee interest in right of way; language stating that no right of way was conveyed not an express reservation of fee). See Hickey v. Pathways Ass'n, Inc., 472 Mass. 735, 752 (2015) (derelict fee statute satisfied where deeds contained "an exclusive reservation of rights in the ways; they grant rights of access over the ways shown on a specific plan or all plans in the subdivision, and explicitly exclude a fee interest"); McGovern v. McGovern, 77 Mass. App. Ct. 688, 690 n.7, 694 (2010) (deed conveying easement rights to driveway "does not contain any 'express reservation' evidencing an intent contrary to the statutory presumption that title in the driveway is to be conveyed to the abutting grantee"). The dissent's reading of the statute would leave Boardman, who sold off his last interest in the development almost half a century ago, owning a sundry, narrow strip of land, contrary to the Legislature's intent.

Thus, if the derelict fee statute applies to the Anthony deed, then the fee to the 7th Shoreway passed to Anthony, and

the Conways, as Anthony's successors, now own the land beneath it.  The Caraglianos contend, however, that the statute does not apply because the Anthony deed related to registered land.

According to the enabling legislation, the derelict fee statute took effect on January 1, 1972, and applied both retroactively and prospectively -- except that it did not apply retroactively to previously executed instruments pertaining to registered land.  See St. 1971, c. 684, § 2 ("[G. L. c. 183, § 58,] shall apply to instruments executed on and after said effective date and to instruments executed prior thereto, except that as to such prior executed instruments this act shall not apply to land registered and confirmed under the provisions of [c. 185] before said effective date").  Although the Anthony deed pertained to land that was registered before the effective date of the statute, the deed itself was executed and registered after the effective date; accordingly, by the plain language of the enabling act, the statute applies.

The Supreme Judicial Court's decision in Hickey, 472 Mass. at 735, is not to the contrary.  In contending that the fee interest did not pass to Anthony, the Caraglianos focus on the following sentence from Hickey:  "Although [the derelict fee] statute does not apply to land registered prior to its enactment, and thus is not applicable to any of the lots at issue here, it does apply prospectively to registered land."

Id. at 752.[8]  Because a few of the Hickey defendants' lots were conveyed after 1971, see id. at 746 n.17, the Caraglianos argued, and the judge agreed, that by stating that the statute "is not applicable to any of the lots at issue here," the court necessarily held -- contrary to the language of the enabling act -- that the statute does not apply to any instruments concerning land registered prior to the effective date, regardless of when the instruments were executed.

We do not read Hickey so broadly.  The primary issue in Hickey was the interpretation of the deeds to the plaintiffs' two lots, which were created by a registered subdivision plan and conveyed to the plaintiffs' predecessors in the late 1930s. See Hickey, 472 Mass. at 740, 745.  Such "prior executed instruments" passing title to registered land are plainly outside the scope of the derelict fee statute.  Although a few of the defendants' lots were conveyed after 1971, the court observed that those deeds all included "an exclusive reservation of rights in the ways," granting access over the ways and "explicitly exclud[ing] a fee interest."  Id. at 752.  The plaintiffs in Hickey argued that the absence of such language in the earlier conveyances proved that "the developers did not intend to retain rights in fees in the ways."  Id.  The court

---

[8] See also Hickey, 472 Mass. at 744 n.13 (statute "does not apply retroactively to registered land").

was not persuaded:  "This more precise language including the reservation of the fees in the documents beginning in the 1970s is better explained as reflecting a response to the derelict fee statute."  Id.  It was in this context that the court stated, in the very next sentence, that the statute did not apply to the lots "at issue here," but "does apply prospectively to registered land."  Id.  That is, the statute did not apply to the plaintiffs' lots, but did apply to the lots conveyed to defendants after 1971, all of which included language that tracked the statute.

Here, by operation of the derelict fee statute, the Anthony deed effectively transferred from Boardman to Anthony, along with lot 211, the fee interest in the 7th Shoreway.[9] Incidentally, it also conveyed the fee interest to the center line of the portion of Westwood Road fronting the lot.  See G. L. c. 183, § 58 ("if the [grantor's] retained real estate is on the other side of such way, . . . the title conveyed shall be to the center line of such way, . . . as far as the grantor owns").

---

[9] The Anthony deed conveyed the fee interest in the entire width of the 7th Shoreway, not just to the center line, because Boardman did not at the time "retain[] other real estate abutting such way."  G. L. c. 183, § 58.  If Boardman had retained property "on the other side of such way, . . . the title conveyed [would have been] to the center line of such way."  Id.

2. Caraglianos' easement rights. While we conclude that the derelict fee statute applies such that the Conways own the fee interest in the 7th Shoreway, the Caraglianos do not claim an ownership interest. They claim an easement.

The parties and the judge appear to have proceeded on the assumption that if Boardman relinquished his fee interest in the 7th Shoreway, he would have been unable to convey easement rights therein. This is not the case. If the lots Boardman retained benefited from appurtenant easement rights in and over the 7th Shoreway, the lots would retain those easement rights when Boardman conveyed them (unless the deeds provided otherwise). See G. L. c. 183, § 15; Dubinsky v. Cama, 261 Mass. 47, 56 (1927); Cheever v. Graves, 32 Mass. App. Ct. 601, 606 (1992). See also Darman, 362 Mass. at 639-640 ("the only easement rights in the land shown on [the plan] that [the grantor] would have retained and could have conveyed . . . would have been rights appurtenant to the lots [the grantor] still owned").

In 1962, when Boardman transferred to the Hazards his fee interest in most of Westwood Road and in the 1st through 6th Shoreways, he expressly reserved "for the benefit of his remaining land, the right to use in common with others entitled thereto, the ways and beaches as shown on plans in Land Court Case No. 11518." His remaining land at the time included that

later shown on the 13 Plan as the 7th Shoreway, the cul de sac of Westwood Road, and lots 211, 212, and 213 surrounding the cul de sac.  The first of those lots to be sold, lot 212, was conveyed along with an "appurtenant . . . right of way in common with others entitled thereto in and over the provided ways shown on plans in registration case No. 11518," which now included the 7th Shoreway.  Lot 212's easement rights did not vanish when Boardman next conveyed lot 211 to Anthony together with the fee in the 7th Shoreway (and a portion of Westwood Road).  Moreover, Boardman still retained lot 213, which he subsequently conveyed to the Hazards together with, as stated on the deed, an appurtenant "right of way in common with others entitled thereto in and over the provided ways shown on [the] plans."[10]

We recognize that "for registered land to be burdened by an easement, generally the easement must be shown on the certificate of title."  Hickey, 472 Mass. at 754.  See G. L. c. 185, §§ 46-47.  In this case, as with the deeds conveying the

_____

[10] Thus, there is no merit to the Conways' argument that because Boardman conveyed their lot, including the 7th Shoreway, before he conveyed the Caraglianos' lot, Boardman had no power to grant any easement over the 7th Shoreway.  Where the evidence shows an intention to benefit all of the lots in a subdivision with rights of way over all of the ways, "[t]he chronology of the conveyances of the several lots out of the subdivision" is "no obstacle" to recognizing the right of way as an encumbrance on the registration.  Rahilly v. Addison, 350 Mass. 660, 663 (1966).

other lots on the 13 Plan, the Anthony deed on its face included

appurtenant easement rights in the ways shown on the plans.

Because, by operation of the derelict fee statute, the Conways'

lot was conveyed with a fee interest in the 7th Shoreway, the

deed's reference to appurtenant easement rights was superfluous

with respect to the 7th Shoreway, but not with respect to the

other ways on the plans.[11]

Even though the Anthony deed incorrectly referred to the

lot as benefiting from an easement, in common with others, to

the 7th Shoreway, rather than being "subject to" or "encumbered

by" it, the language of the deed was sufficient to put Anthony

and her successors on notice of the existence of others'

easement rights. "[E]ven where the certificate of title does

---

[11] The conveyance of easement rights to the ways shown on the plan may be evidence that Boardman did not intend to transfer a fee interest in the ways. See Loiselle v. Hickey, 93 Mass. App. Ct. 644, 648-649 (2018) (provisions in deeds giving lots rights to use adjacent ways would have been unnecessary if developer had intended to convey title to same). But see Rowley, 438 Mass. at 803 (purpose of enacting derelict fee statute was "to meet a situation where a grantor has conveyed away all of his land abutting a way or stream, but has unknowingly failed to convey any interest he may have in land under the way or stream, thus apparently retaining his ownership of a strip of the way or stream" [quotation omitted]). As noted supra, such evidence of intent has no probative value in light of the derelict fee statute -- only the language of the instrument matters. However, largely for the same reasons that the judge concluded that Boardman did not intend to transfer away his fee interest in the 7th Shoreway, we conclude that he clearly intended to retain easement rights for the benefit of his remaining property. That intent is apparent on the documents in the registration case.

not show an easement, courts nevertheless can find registered land [to be] impressed with an easement if a review of the certificate revealed facts 'which would prompt a reasonable purchaser to investigate further other certificates of title, documents, or plans in the registration system' that memorialized such an easement." Loiselle v. Hickey, 93 Mass. App. Ct. 644, 650 (2018), quoting Hickey, 472 Mass. at 755-756. "If a plan is referred to in the certificate of title, the purchaser[s] would be expected to review that plan," Jackson v. Knott, 418 Mass. 704, 711 (1994), and "investigate further other certificates of title, documents, and plans contained within the registration system, at the time of their purchase, to determine both their own rights and whether others have rights." Hickey, 472 Mass. at 759. Of particular significance here, "where a parcel of registered land involves a lot bounded by a way, and the deed or certificate of title refers to a plan, a potential purchaser is on notice that the property is bounded by a way and that others may have easements in the way." Id. at 756.

The reference in the Anthony deed to a right of way, "in common with others," in and over the ways shown on plans in the registration case would have prompted "a reasonable purchaser of registered land," Hickey, 472 Mass. at 756, to review at least the most recent plans and the deeds to the neighboring parcels. Such a review would have disclosed that all of the relevant

deeds referred to the same easement rights. Cursory examination of the 13 Plan would have revealed that the 7th Shoreway primarily benefited the inland lots with appurtenant easement rights. Further examination of the documents in the registration system would have led to the 1962 Hazard deed, in which Boardman relinquished the fee in the ways adjacent to the lots he was then conveying, but reserved "for the benefit of his remaining land the right to use in common with others entitled thereto the ways and beaches as shown on plans in Land Court Case No. 11518." Indeed, the history of the development showed that all of the preceding plans, certificates of title, and deeds expressly granted easement rights over all of the ways shown on the plans in the registration case. To be sure, reference to plans "laying out a large tract, does not give every purchaser of a lot a right of way over every street laid down upon it." Jackson, 418 Mass. at 711, quoting Pearson v. Allen, 151 Mass. 79, 81 (1890). Here, however, it is apparent that access to the roads and shoreways shown on the plans was an "integral" aspect of the development as a whole. Darman, 362 Mass. at 640.

In Hickey, 472 Mass. at 760-761, as here, the plans showed a pattern of evenly spaced ways to the water between every three or four lots, along with a network of interconnecting inland ways, demonstrating a clear intent to allow inland lot owners to

use the ways to reach the beach. The trial judge concluded, and the Supreme Judicial Court agreed, that a purchaser would have seen a "progression of the development," and that "a review of the defendants' certificates that reference plans showing the way would have informed the plaintiffs that the grantors intended to convey easement rights to those lot owners, even though the easements are not noted on the plaintiffs' certificates." Id. at 759. In Myers v. Salin, 13 Mass. App. Ct. 127, 137 (1983), we observed that where a large number of persons have a right of way to the beach, "it may have been impractical to state with precision in the certificate of title all the persons holding an affirmative easement of passage" and that, like here, general references in the certificate as to the existence of those easements "may have been all that was thought feasible." Id. As in Hickey and Myers, in the circumstances of this case, the registration requirements of G. L. c. 185, §§ 46-47, were satisfied. The Caraglianos enjoy the benefit of an express easement over all of the ways shown in the plans on file, including the 7th Shoreway.

3. Scope of the easement. a. Trial judge's findings and orders. After the above issues were resolved by summary judgment, a trial was held to address the remaining issues. Before trial, the parties agreed that the issues before the judge were whether the easement allowed the Caraglianos to drag

vessels over the 7th Shoreway to reach Buzzards Bay and to sit, recline, or otherwise remain stationary within the 7th Shoreway; whether the Conways' alterations to the 7th Shoreway unreasonably interfered with the Caraglianos' deeded rights; and whether the Caraglianos were entitled to an order directing the Conways to remove encroachments and restore the 7th Shoreway to its prior condition.

The judge found that the Conways' renovations prevented the Caraglianos from using the entire forty-foot width of the 7th Shoreway for walking to and from the beach and ocean and from safely carrying kayaks, dinghies, or sailboats. The judge also found that the plantings and large stones prevented most vehicles from reaching the embankment. The judge further concluded that Boardman, the original developer, intended for the shoreways to give easement holders access to Buzzards Bay for fishing, swimming, boating, and other uses traditionally reserved for the public in tidal waters. The judge declared that the Caraglianos' rights included the ability to use the 7th Shoreway to transport vessels, either by foot or by motor vehicle.

Moreover, relying on rules of statutory construction, the judge concluded that "the language in the Caraglianos' deed that gives them a right of way 'in and over' the 7th Shoreway carries with it the right to occupy the Shoreway temporarily, for

purposes such as sitting, reclining, and recreating." The judge reasoned that granting rights "over" the 7th Shoreway would have been sufficient to grant rights of ingress and egress, so that the grantor must have intended something more than mere access rights by using the term "in and over." The judge further reasoned that creating seven shoreways would have been unnecessary if Boardman's intent was merely to provide access to Buzzards Bay; the judge inferred that the many shoreways were intended to provide a series of oceanfront, park-like spaces for inland lot owners to picnic and play. The Caraglianos' easement rights were not unlimited, however; although the terms of the easement gave them the right to occupy the 7th Shoreway for certain activities, the judge concluded it did not give them the right to park cars on it.[12]

Next the judge considered whether the Conways' landscaping changes to the 7th Shoreway interfered with the Caraglianos' easement rights. The judge found that the Conways "ha[d] occupied the Shoreway permanently with fill, boulders, plants, part of a driveway, and an irrigation system." Because the

---

[12] The judgment declared that the Caraglianos, "in common with all others entitled thereto, may sit, recline in, or otherwise remain within the 7th Shoreway temporarily for activities such as watching sunsets, the ocean, fireworks, boat races, and birds; having picnics and drinks; and recreating, but not for purposes of parking vehicles." The Caraglianos do not contest the judge's ruling that they may not park on the 7th Shoreway.

judge had determined that the Conways did not own the fee in the 7th Shoreway, but merely held easement rights in common with others, the judge concluded that the alterations made by the Conways exceeded their easement rights and unreasonably interfered with the Caraglianos' and other easement holders' rights to use the entire width of the way.  The judge thus ordered the Conways to remove the encroachments unreasonably interfering with the Caraglianos' deeded rights.  The judge did not specify what steps had to be taken to restore the 7th Shoreway, in part because certain restorations might require State and local government approvals.  Instead, the judge ordered the Conways to submit a plan for restoring the 7th Shoreway, at their expense, to the extent necessary to permit the Caraglianos to exercise their easement rights.  The Conways challenge these rulings.

b.  Discussion.  "In analyzing the extent of an easement, we look 'to the intention of the parties regarding the creation of the easement or right of way, determined from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or which they are chargeable to determine the existence and attributes of a right of way.'"  Martin v. Simmons Props., LLC, 467 Mass. 1, 14 (2014), quoting Adams, 64 Mass. App. Ct. at 389.  See Mazzola v.

O'Brien, 100 Mass. App. Ct. 424, 427 (2021) ("The general principle governing the interpretation of deeds is that the intent of the parties is ascertained from the words used in the written instrument interpreted in the light of all the attendant facts" [citation omitted]).  The scope of easement rights is a question of law.  See Tenczar v. Indian Pond Country Club, Inc., 491 Mass. 89, 104 (2022); Mazzola, supra.  "Doubts as to the extent of a restriction in an easement 'are resolved in favor of the freedom of land from servitude.'"  Martin, supra, quoting St. Botolph Club, Inc. v. Brookline Trust Co., 292 Mass. 430, 433 (1935)

We begin with the language of the easement.  The Hazard deed, like all of the other deeds conveying the lots shown on the 13 Plan, included an appurtenant "right of way in common with others entitled thereto in and over the provided ways shown on plans in registration Case No. 11518."  The dictionary definition of "right of way" is "[t]he right to pass through property owned by another."  Black's Law Dictionary 1587 (11th ed. 2019).  We agree with the judge that the right of way includes the right to pass and repass over the 7th Shoreway by foot and vehicle.[13]  See Chatham Conservation Found., Inc. v.

---

[13] The record does not support the Conways' argument that Boardman did not intend to grant the right to use vehicles on the 7th Shoreway.  The width of the shoreway, its proximity to the ocean, the unrestricted language of the deed, and fact that

_Farber_, 56 Mass. App. Ct. 584, 589-590 (2002) (discussing nature of easements to "pass and repass" rights of way). However, the term "right of way" does not suggest that easement rights in and over the 7th Shoreway, or any of the shoreways, would include sitting, reclining, or picnicking.

Nor do we infer such intent from the use of the two prepositions "in and over," as opposed to simply "over." No published case has interpreted such language to grant additional rights beyond those typically associated with a right of way. Indeed, numerous decisions have construed easements including "in and over" language without assigning any special meaning to the formulation. See, e.g., _Walker_ v. _E. William & Merrill C. Nutting, Inc._, 302 Mass. 535, 538 (1939); _Stevens_ v. _Young_, 233 Mass. 304, 309 (1919); _Lipsky_ v. _Heller_, 199 Mass. 310, 315 (1908); _Barnes_ v. _Haynes_, 13 Gray 188, 191 (1859); _Phillips_ v. _Bowers_, 7 Gray 21, 23 (1856). In _Phillips_, the court held that the grantees' rights "in and over" property set aside as a "street" included "the use and appropriation of all the sand, gravel, stone and other material on or under said street, which would be suitable and useful, for the construction and repair of such street." _Id_. at 22-23. This holding is simply a nascent

---

vehicular use was common when the right of way was granted combine to compel the conclusion that the scope of the right of way over the 7th Shoreway included vehicular use.

example of the now well-established principle that "the right to pass and repass . . . include[s] all rights reasonably incidental to the enjoyment of the right to pass, including the right to make reasonable repairs and improvements to the right of way." Chatham Conservation Found., Inc., 56 Mass. App. Ct. at 589.

Importantly, the deeds and plans do not suggest that the shoreways were to be treated differently from the other subdivision ways. The language of the deeds does not differentiate the easements granted "in and over" the shoreways from the easements granted "in and over" other subdivision ways -- both are encompassed as "the provided ways shown on plans" in the registration case. All of the shoreways as shown on the plans are forty feet wide, the same width as the inland subdivision ways. As the Conways persuasively argue, if the easement included the right to sit, recline, and picnic on the shoreways, it would necessarily include the right to do so on all of the subdivision streets.

We acknowledge that "[i]n the absence of express limitations, . . . a general right of way obtained by grant may be used for such purposes as are reasonably necessary to the full enjoyment of the premises to which the right of way is appurtenant." Cannata v. Berkshire Natural Resources Council, Inc., 73 Mass. App. Ct. 789, 795 (2009), quoting Tehan v.

Security Nat'l Bank of Springfield, 340 Mass. 176, 182 (1959).
We nonetheless conclude that sitting, picnicking, or similarly
occupying the 7th Shoreway is not reasonably necessary for the
full enjoyment of the Caraglianos' property -- or that there is
any evidence that Boardman intended to grant such rights.[14]  The
scope of the Caraglianos' easement must be modified to declare
that they enjoy a right of way to pass and repass over the 7th
Shoreway by foot and vehicle, including the right to transport
vessels and equipment over the way, for fishing, swimming,
boating, and other uses traditionally reserved for the public in
tidal waters, as well as the right to make reasonable repairs
and improvements to the 7th Shoreway incidental to those rights.
See Kubic, 98 Mass. App. Ct. at 303-304.

     c.  Remedy.  Finally, we turn to the portion of the
judgment that ordered the Conways to remove the encroachments
that unreasonably interfered with the Caraglianos' use of the
7th Shoreway.  Because that order was premised on the conclusion
that the Conways did not own the fee interest, but possessed
only easement rights in common with others, and perhaps also on

---

[14] We do think that an inference can be drawn from the
creation of seven shoreways that Boardman intended to create a
series of park-like open spaces, rather than conveniently
located means of access to the shore, for the inland lot owners.
The 6th Shoreway may be an exception; some of the title
certificates include specific language concerning the nature of
the easement rights reserved for the use of the 6th Shoreway in
particular.

the conclusion that the Caraglianos had the right to sit, recline, and picnic on the 7th Shoreway, we think the prudent course is to remand the case with respect to the remedy.

We express no opinion whether, in light of the easement rights over the 7th Shoreway belonging to the Caraglianos and others, the Conways as fee owners may make any alterations to the 7th Shoreway that they could not have made as mere owners of common easement rights. "An easement is a nonpossessory interest that carves out specific uses for the servitude beneficiary. All residual use rights remain in the possessory estate -- the servient estate." Martin, 467 Mass. at 14, quoting Restatement (Third) of Property (Servitudes) § 4.9 comment c (2000). Nonetheless, as the Conways themselves have argued, the 7th Shoreway must be treated the same as the other shoreways and inland subdivision streets, and it may be that some or all of the encroachments identified by the judge continue to infringe on the Caraglianos' easement rights regardless of the Conways' status as fee holders. Accordingly, on remand the judge should reconsider precisely what steps the Conways, as fee owners of the servient 7th Shoreway, must take to permit the Caraglianos and others to exercise their easement rights as necessary for full enjoyment of their dominant estates, consistent with this opinion.

Conclusion.  We affirm that portion of the judgment declaring that the Caraglianos' property enjoys an easement over the 7th Shoreway.  In all other respects the judgment is vacated, and judgment shall enter declaring that the Conways own the fee interest in the 7th Shoreway, and declaring the scope of the Caraglianos' easement rights as set forth herein.  The matter is remanded for further proceedings to determine the actions the Conways must take to allow the Caraglianos to exercise their easement rights.

So ordered.

RUBIN, J. (dissenting). This case should be a matter of serious concern to anyone who owns or rents property near the beach whether on the Cape, the Islands, or anywhere else in the Commonwealth. Because their deed says they do not, I do not think that the Conways own a fee interest in the 7th Shoreway or the portion of Westwood Road abutting their lot, and I am concerned for all owners of inland property in beachfront developments in the Commonwealth about the serious consequences of the court's mistaken holding that the Conways do.

The derelict fee statute provides that "[e]very instrument passing title to real estate abutting a way, whether public or private . . . shall be construed to include any fee interest of the grantor in such way . . . , unless . . . the instrument evidences a different intent by an express exception or reservation and not alone by bounding by a side line." G. L. c. 183, § 58. Here the operative 1975 deed transferring lot 211, the Conways' lot, from Boardman to Anthony, the Conways' predecessor in interest, provided, "There is appurtenant to the described premises a right of way in common with others entitled thereto in and over the provided ways shown on plans in registration case No. 11518."

That language explicitly conveyed to Anthony something other and less than a fee interest in the private ways abutting lot 211, including Westwood Road and the 7th Shoreway. Under

the derelict fee statute, it is an "express exception . . . and not alone by bounding by a side line" to the inclusion of the grantor's fee interest in the abutting ways. See Loiselle v. Hickey, 93 Mass. App. Ct. 644, 648-649 (2018) (provisions in deeds giving lots rights to use adjacent ways would have been unnecessary if developer had intended to convey title to same). To be clear, contrary to the court majority's description of my views, it is not an "express reservation" of that fee interest. It is an express exception to the grant of the fee interest. Nor am I saying, as the majority would have it, that this is an "implicit[] reserv[ation of] a fee interest." Ante at      . It is an explicit exception to the granting of a fee interest to Anthony, who was explicitly conveyed "a right of way in common with others," not a fee interest.

This explicit exception, reflective of the grantor's intent is not "'attendant' evidence," but is contained in the text of "the deed itself," Tattan v. Kurlan, 32 Mass. App. Ct. 239, 243-244, 247 (1992). See Loiselle, 93 Mass. App. Ct. at 648-649 (provisions in deeds giving lots rights to use adjacent ways is explicit demonstration on face of deed that developer did not intend to convey title to those ways). This reading is consistent with Tattan, in which, although fifty-foot strips of land abutting the defendants' lots were designated on a plan for a "future roadway," and a "prospective street," the deeds at

issue were silent as to what interest the defendants obtained in those strips.  Tattan, supra.  Indeed, the derelict fee statute's "object was 'to meet a situation where a grantor has conveyed away all of his land abutting a way or stream, but has unknowingly failed to convey any interest he may have in land under the way or stream, thus apparently retaining his ownership of a strip of the way or stream'" (emphasis added).  Rowley v. Mass. Elec. Co., 438 Mass. 798, 803 (2003), quoting letter of Governor Francis W. Sargent to the Legislature dated April 9, 1971, 1971 House Doc. No. 5307 (returning bill for further amendment).  This grantor did not "fail to convey any interest" in the 7th Shoreway so that a conveyance by operation of law is required; he explicitly conveyed easement rights and only easement rights in that shoreway.

Construing the deed as it is written to provide the Conways common easement rights in the 7th Shoreway gives meaning to all the deed's provisions and, because it gives effect to the plain language of the deed, is consistent with the reasonable expectations of all parties.

The error in the court majority's reading of the deed to give the Conways the fee interest in the 7th Shoreway is clear, as even the court must recognize, since to reach it, the majority has to rewrite the deed it purports to be construing, reaching a conclusion for which there is no evidence, but on

which the court's decision ultimately necessarily rests, that the "the Anthony deed incorrectly referred to the lot as benefiting from an easement, in common with others, to the 7th Shoreway, rather than being 'subject to' or 'encumbered by' it." Ante at        .  The court's reasoning is circular:  The Conways have a fee interest, so the reference to having an easement in their deed must be a mistake, so we will rewrite it to say that rather than having easement rights, it is "subject to" someone else's easement rights, so now there is nothing in the deed inconsistent with having a fee interest.

Indeed, notwithstanding its claim that there was an error in the Anthony deed, the court majority recognizes that the easement language in that deed actually does reflects an intent not to convey the fee interest in the 7th Shoreway.  It says, though, that that "evidence of intent has no probative value in light of the derelict fee statute -- only the language of the instrument matters."  Ante at note 11.  But this evidence is in "the language of the instrument"!

The exact same easement language in other deeds, including the Caraglianos', is read by the court to grant easement rights in the 7th Shoreway.  But where that language appears in the Conways' deed it is read to mean its opposite.  Having construed the deed to have conveyed a fee interest in the 7th Shoreway to the Conways without first properly considering the deed's text,

the court majority has no plausible explanation for the deed provision granting them instead easement rights. There is no basis for saying that there was an error in the deed, and that the grantor meant instead that they had a fee interest subject to easement rights: By its terms, on its face, it conveyed easement rights, not a fee interest, in both the 7th Shoreway and the abutting section of Westwood Road, to which today's decision also applies.

Only once the court majority has rewritten the deed by removing the language contradicting its grant to the Conways of the fee interest in the abutting ways, can it apparently comfortably apply the derelict fee statute. But that statute commands us to read the deed, and, only if there is no express exception to the inclusion of the grantor's fee interest in the abutting ways, to apply it and hold the fee in the abutting way was transferred along with the fee in the property. It does not command us to rewrite deeds to remove exceptions that would prevent the application of the statute in order that we may apply it. If the grant of an easement in the 7th Shoreway isn't an express exception, the court's decision would not require the conclusion that it must be a mistake. And since it can't be squared with the Conways having a fee interest, it is an express exception.

Why should this be a matter of grave concern?  As the Supreme Judicial Court has held, an abutting landowner who owns the fee interest in an easement may in many circumstances unilaterally narrow that easement, even in the face of plans that explicitly demarcate its width.  See Martin v. Simmons Props., LLC, 467 Mass. 1, 12 (2014).  One doesn't have to go to the beach too many times in the Commonwealth to realize the extraordinary value of the land that comprises deeded rights of way to the beach.  Those rights of way are essential to the very value of all the inland property that is permitted by deed to use them.  Nor can one long miss the powerful desire of some abutting ocean-front landowners to make the use of these ways by those lawfully entitled as difficult as possible.  Indeed, in this very case, the Conways have unnecessarily built a driveway across the entire width of the easement, for no apparent reason but to block its use by all who have deeded rights to do so.

Perhaps in this case, though it is by no means certain, it will not matter who owns the fee in the 7th Shoreway.  It is a forty-foot wide private way and the fee owner can take actions that might affect its dimensions only "to permit normal use or development of the servient estate," and only if they do not "increase the burdens on the owner of the easement in its use and enjoyment."  M.P.M. Builders, L.L.C. v. Dwyer, 442 Mass. 87, 90 (2004), quoting Restatement (Third) of Property (Servitudes)

§ 4.8(3) (2000).  On remand, I am hopeful the judge will require the Conways to remove all the encroachments currently on the 7th Shoreway, including the fill, boulders, plants, driveway, and irrigation system, and to restore it to its previous condition. But that is no sure thing.

More important, there are likely many, many other deeds written in the way the deed here was that convey the property abutting private ways with easement rights over those ways, ways that are also used as of right by inland property owners, residents, and renters in beachfront developments throughout the Commonwealth.  Until now, the abutters to these private ways would have understood themselves, under the plain language of their deeds, to have only equal easement rights in those ways. If it is not reversed, today's erroneous reading of such deeds to convey a fee interest in those ways under the derelict fee statute, rather than the mere easement rights the deeds explicitly convey, and that the purchasers therefore understood they received -- a reading based on a conclusion that the easement language deliberately included in all those deeds, reflecting an intent not to convey a fee interest, was "incorrect," no less, and must be read to mean its opposite -- likely will encourage attempts by abutting landowners to occupy and narrow those rights of way, which are necessary for beachfront development, which are utilized by myriad inland

property owners, residents, and renters in such developments, and which are essential to the value and utility of those inland property owners' land.  Needlessly upsetting the reasonable expectation of property owners who relied on the language of these deeds is not our job, nor is the needless creation of conflict on the ground among neighbors, or litigation in our courts, about access to the Commonwealth's precious and wonderful oceanfront.  I respectfully dissent.

<u>Appendix</u>.



NOTE:
Caragliano's Parcel, Lot 242, is derived from Lot 2 on L.C. Plan 11518-T sh.1 and part of Lot 213 on L.C. Plan 11518-13.